Good morning, Your Honors. Bruce Preit on behalf of the appellants. May it please the Court. I'd like to reserve three minutes for rebuttal. I'm assuming the Court got our letter brief about the Escondido v. Emmons case that came down last week from the Supreme Court on qualified immunity. And I understand in this case where the district judge perhaps had some difficulty wrestling with the, at that time, recently released case of White v. Pauley. And the Court had some trouble finding, how do I find a specific case? But since that time, the U.S. Supreme Court has consistently come down stressing, especially in Fourth Amendment cases, where the specificity of the case to clearly establish law under Fourth Amendment is particularly important. And in this case, the district judge, it was interesting because the district judge gave the plaintiffs an opportunity to file supplemental briefs and say, you have not come up with a case of clearly established law, but I'll give you an opportunity to come up with something in two weeks. After they filed their supplemental briefs, even the district court said, your supplemental briefs are unpersuasive and incomplete. But then the Court, inexplicably, at least to me, said the Court nonetheless finds that these two cases, Glenn v. Washington County and Hayes v. County of San Diego, are sufficiently clearly established to put these officers on notice that their conduct on this particular date would have violated clearly established law. However, when you look at those two cases, as the Supreme Court said in Sheehan, the differences leap off the page. And no matter how many times the officers could have read either Glenn or Hayes, it would not have been beyond debate, which is the language in the Supreme Court, that their actions in this instance would have violated a clearly established constitutional right. Glenn, of course, and even the Supreme Court has said, is not a case of clearly established law in these types of situations. Factually, it's so distinguishable in that there was no crime in that case. It was a young man who had a knife to his own throat. It was suicide, reportedly suicidal. Whereas in this case, it was interesting that the district judge said, in this case, as the Court is saying that there's an individual who has broken into her home, is threatening her with scissors, which turned out to be the gardening shears, turned out with scissors, has exposed his penis to her, broken back into the house after he left once, and is strangling her dog. That's not what was going on at the time that he was shot, is it? No. But that's the officer's state of mind of who they're dealing with. But the 9-1-1 call said a drunk individual also. She did make a comment that he appeared to be drunk. So a lot of time passes, though, after that. A lot of time in which the officers apparently didn't think it was urgent to use deadly force. As he's walking along and there's minutes that go by and he has the shears and they're following him. In that time, he's away from the victim and there are no other people at risk, are there? Well, and that's, I think, the critical point. And these cases with the video, although this one happened to be a cell phone video, are going to more and more come before this court because we're getting the body-worn cameras, the dash cam, more and more. And I think you can't just discount the fact that he is a suspected, a reasonable officer believes he's a suspected sexual assault suspect. I understand that. And I give you that. We're putting together what's in the officer's mind based upon data that they got. So we're to consider the 9-1-1 call, what the woman said, that they took it as what occurred, and you had a very suspicious man appearing to be drunk and he's carrying some shears. But then it goes on for blocks, a couple of blocks. I watched the video and this is, I have many, many cases I've had over the years where they said you should have used tasers. And here both of them tried tasers and the tasers didn't work. And they're talking him to the rest of that that's going on. And I understand, they haven't done anything yet. But then we get up to the intersection and it's not clear in my mind, if I understand correctly, the officers believe, whether it's a fact or not, the officers believe that at that corner they would run into some other individuals and there may be a safety problem. So they had a reason for wanting to confront and stop. Now, I'm not quite clear what happened at the very end before the trigger was pulled. What does the record show? I couldn't, I've looked at the viewing and I couldn't get that. But there's some discussion by the officers that there was some type of a threat that came to them because of using these scissors or whatever they are. But they are an instrument that could cause death. So they have to be concerned. What happened specifically just before the trigger was pulled that alerted them that caused all this difficulty as far as the record is concerned? Sure. And two things. And the District Court recognized this but then, for whatever reason, discounted it. Two things. The officers know that right at that corner there is a very crowded bakery at lunchtime. This is at lunchtime. Their feeling is they cannot let him get into that bakery with those shears, scissors, whatever we want to call them. Or if they'll have a hostage situation or another assault of some type. Yeah. So at that point, Officer Lin makes the decision that they don't want to use deadly force. As you know, they tried tasers, they tried talking in Spanish, English, everything. But at that point... They never said we're going to use deadly force if you don't drop the shears though. They did not say that. They said drop the shears. Officer Lin then makes the decision to, frankly, endanger his own safety by trying to approach the individual and leg sweep him and take him down so he can't make it into the bakery and create a greater threat. Yeah. At that point, what you do see on the video, and I know you almost have to freeze frame it, the individual does turn toward the officer and even the court, in its opinion, cited that he had the shears raised over his head. That's the point. Now where is the evidence of that? If you freeze frame it and the court, the district court actually talked about that. That's, and I thought I had made a reference to the record, where in the district court's opinion, they say that he does raise the the shears in his right hand as he turned towards the officer. Okay. So this is a finding by the district court based upon what was before the district court. Okay. So then what happens after he raises his, according to the facts of the district, he raises the shears up? That's when both officers fire, because at that point, and they got it down to inches, he is less than six feet seven inches from the officer raising the shears in an aggressive manner. The officer at that point realizes he's not going to be able to leg sweep him, but in fact would have been cut had he not deployed deadly force. So there's a witness, Chavez, who says he never raised the shears. And you are saying, we can tell from the video, he definitely raised the shears, but I've watched that video and I can't figure out if he raised the shears. So I'm having trouble understanding how you're taking the facts in the light most favorable to the plaintiff. I don't think he, I don't believe Mr. Chavez ever says he never raised, he said he turned. Because he has his hands in front of him normally. And that's the problem with the timing. All right. Because Mr. Chavez then says he does turn towards the officers, although with a leading question, was it a normal sort of turn? And he says he does turn toward the officer. And he does have the shear in his hands, six feet from the officer. It says, was it above his head? No. I mean, I don't understand how you can read that testimony as anything other than he's not raising the shears up. The district court, in its opinion, says he does raise. The district court can't resolve facts at summary judgment, right? If there are disputed facts, it has to go to trial. And you have to take the facts in the light most favorable to the plaintiff. So I'm not, I'll have to find the statement you're saying, but it's sort of irrelevant whether the district court thought it was resolving a fact, because it can't do that anyway. But I think, and we've all watched the video, and I invite you to watch it again. If you literally take it down to the split seconds in the half speed, and I think you've gotten three different versions, full speed, half speed, and quarter speed. In half speed, at two minutes and two seconds, you can see him raising the shears in his right hand as the officer approached him. And I invite you to watch it again and freeze frame it if possible. There's no question that he turns to the officer, raising it, and he has previously been swinging the shears at the officers. There are shears with two hands. He's got them in one hand. He's stumbling around. He actually fell backwards and hit the ground once. I agree with you. If the officers were faced with a lunge or something like that, they were entitled to use deadly force. But if they just made up in their mind that if he gets any closer, we're going to shoot him, they're not. And isn't that a factual issue here? Well, one, I don't think it's a factual issue, because I say in the video, I think you can see that he raised it. But secondly, I mean, yes, the officers fired because they believed that they were in immediate danger. But if you look at even at this Court's opinion in Blanford v. Sacramento and the Supreme Court in Scott v. Harris, it's an officer's reasonable belief that this person is a danger to the public. They could not let him get around that corner. It doesn't have to be an actual one. Well, Chavez actually disputes whether the bakery had people in it and whether there was anyone else around, right? So that's another fact that you're assuming in the officer's favor. But Chavez says it's not true. But, well, Mr. Chavez is driving by. It doesn't have to be an actual belief. And that's what Blanford says. If an officer has a reasonable belief based on their familiarity with the lunch crowd at that very popular bakery, it could have been empty. It could have been closed. But that's not – that would not give them a reason to shoot and kill him. That would not. But that does give them reason to intervene. To come closer to him and to try to block his path. Right. But then what does he do in response to that is where we're having issues. You're saying it's clear on the video that he makes a threatening gesture with the shears. And I just didn't see it. And it was even, quite frankly, clear that to the district court, and it is in the record at 10, at page 10, where the district court actually cited to the video that he removed the shears and was holding them above his head as he turned. But then the district court says, other than that evidence, there was no threat. There was no lunge like the officers testified to. Well, I mean, if he's six feet from him, does he actually have to go through? And I don't think that the court, this court or any court, is going to say an officer has to actually be in the process of being assaulted. If he raises it, and this court has many times said, if there's threatening gestures, that's sufficient. Mere having a weapon in your hand is not enough. But the threatening gestures and raising it over your head, turning to the officer. Don't we need to think it's undisputed that he was raising it above his head and actually threatening rather than just holding it? Well, clearly, he's not just holding it. And again, I'd invite the court if you look at it again. But the district court found that he did raise it over his head. They watched the same video. They reviewed the same record that he raised his head and turned to the officer. And then the court said, quote, other than that evidence, there's no evidence of a threat. Well, I don't know how you call it. There's no evidence of a threat when even the district court made a finding based on the record. Is that a finding? I mean, it's a summary judgment. You're not making factual findings there. You're saying, you know. I think the district court did look at the record, which included the video, and watched the video, and perhaps reframed it. I didn't ask the district court how it came to that conclusion. And I watched it again last night. And you do see, at two minutes and two seconds in the half speed, it is raised over his head as he turns to the officer. So I don't think that's a. The district court said is he was holding the shears above and around his head as he backed away from the officer. So the district court doesn't see it the same way. We've looked at it slowly. We don't see it the same way. Isn't that the exact kind of thing that needs to go to a jury for a factual determination? What was really happening here? Well, and if the court believes that's a factual question of material fact, we still then have to look to the second prong, and was there clearly established law? Even if there's a disputed fact. Well, isn't it clear that you can't use deadly force unless someone is a threat? I mean, that's clear, right? You can't just shoot someone. Of course. You can use deadly force if the officer reasonably believes. They don't have to be an actual threat. But reasonable belief that he is a threat to either the officers or the public. But it has to be an imminent threat, right? That's clearly established? It does have to be, and I don't know how you say it's not an imminent threat when somebody is raising shears. Well, you're going back to him raising the shears. If that's contested and it's possible he's just holding the shears, as he was for the last three minutes and they didn't shoot him then, then isn't it contested whether he's an imminent threat? But he wasn't just holding the shears. Now you have to go back to the officer's state of mind that he's threatened this dog, exposed himself, broke into a house, and if you watch the video, clearly he is continually waving the shears at the officers. He's not just walking down the street holding these shears. He has already demonstrated a willingness to use it as a weapon to threaten the woman, to threaten the officers, albeit, yes, they used commendable restraint by not shooting him then. They probably could have. But they tried their tasers. They tried to verbally talk him down. Only at the point when they believe he is now going to become an extreme danger to the other members of the public, do they endanger themselves, he turns to them. I don't know what his intent was, and I don't think it matters. It's the officer's reasonable belief. Are you familiar with the case George v. Morris from our court about a guy who was holding a gun, but it was pointing down instead of up? Yes. So why doesn't that case clearly establish that if, unless the deadly weapon is actually an imminent threat at the moment of shooting, that the officers can't shoot because having a deadly weapon isn't enough. And there's plenty of cases, George being one of them, where just possession of a weapon itself is not sufficient. But when you combine the totality, as in Gregory v. Maui and Marquez v. Phoenix, when it's a totality that he's continually defying the officer's commands. When he has- They never said, we're going to shoot you unless you stop. We're going to shoot you unless you put the weapon down. They never actually gave him a command that told him that he was going to be shot. And I think our court had said, you need to warn before using deadly force is possible, right? Well, and I think in Judge Trott in Gonzalez v. Anaheim wrote an opinion that said, if an individual is continually defying commands, then it's not feasible that an additional warning or command is going to gain any result. And the commands, these officers- Do they respond now? In this circumstance, I don't think at all, because he was continually telling him, drop the weapon, stop, get on the ground. He's not complying with anything. I don't believe that you're ever going to find police officers in the real world, Hollywood maybe, they're going to say, stop or I will shoot. It's typically drop the weapon, get on the ground, stop, stop. A uniformed police officer- Young boy of color was carrying a fake AK, but looked very much like an AK, you're familiar with that case? The Sonoma case. Yeah. Yes. And over a very strong dissent, our court held that it was insufficient. The boy was actually turning and bringing the weapon up and defying, an AK. And the officer shot. That, it seems to me, is a much stronger case, even than this one, because you can dodge, perhaps, a shear, but that AK will go through an automobile door and kill people. And yet, in that case, our court has held that that has to go to trial, as a matter of fact. Now, how would you distinguish that case? I'm not a great fan of the case, but- I understand. But it's the law we're going to apply. How would you say that your case is stronger than that one? And I think in that case, two things, major things. One, we don't have the foundation that we have in this case. There's a reported violent crime, sexual assault, breaking into a woman's house, trying to kill her dog, threatening her with a weapon. That wasn't present in the Sonoma case. In that case, you also have, and obviously you recall- Very well. That in that case, it came down to the factual question being a matter of inches. Whether it was actually- The gun was coming out. Right. And so I don't think, because we have video, which you didn't have in that case, and that's why I think it's important in this instance, and in many cases coming before the court in the future, that the video is going to be eliminating a lot of these material facts. I'll be- If this video is subject to interpretation, and it seems not everyone sees it the same way you claim to see it, then isn't that a thing that the jury has to look at and determine whether the inches are there, the turning, the direction, and whether it's above his head? All these things are things that maybe a jury needs to watch this video and think about. And let me assume for the court's benefit that maybe that is a factual issue. How do we then still get to the clearly established prong of the qualified immunity that nonetheless exists under these circumstances, with these officers' belief, with this foundation, would it have been beyond debate to any police officer, under what they observed in the circumstances at this time, that they would be violating constitutional right to this individual with this entire foundation of facts, that they could use deadly force for two reasons. One, because he was an imminent threat to them. And whether you dispute whether he has the shears over his head or not, I represent it's in the record. Or two, that he's an imminent threat to the public if he gets around that corner. But what the trial court would have to do, and it's cumbersome, is submit basically interrogatories to the jury. Did he lunge at the officers? If he lunged at the officers, then they're entitled to use deadly force and they're entitled to qualified immunity at least. But like Morales versus Fry, right? That where Judge Kunauer decided the jury should decide qualified immunity, no. But there are factual issues about what happened in that case that will determine whether it was reasonable for the officers to do what they did and whether it was clearly established right. So your officers said in their depositions that he lunged at them. If that was in their mind, that he's lunging at them, well, that's something to consider. But it's different than saying what the video seems to show. And here's the dilemma that the trial attorneys are going to have now is, in order to get qualified immunity, it's no longer going to be at the earliest possible phase. It's not a defense any longer. It's going to be something that's going to have to be factually decided. Interrogatories. So, and quite frankly, I'm unaware of any Ninth Circuit case, there's a Seventh Circuit case that says that the district court has to allow for special interrogatories to the jury to decide if these factual issues exist. And then the court can determine as a matter of law, qualified immunity. And if nothing else, I think in this case, we need a case from the Ninth Circuit. There's cases in the Ninth Circuit that say it's discretionary, whether the district judge can allow special interrogatories. But if that's going to be the standard, that factual issues in order to get qualified immunity have to be decided by the jury. In order to preserve the qualified immunity, then I think the district courts need to be told, you must allow those factual determinations to be made by the jury through special interrogatories. And then the district court would make the- I'm very interested in that because Judge Kuhnhauer decided he didn't want to deal with Morales versus Fry anymore, and now it's my case for trial. And now it's discretionary. And so I think that that, if nothing else, needs to be mended. But I do think the important thing in this case is the clearly established prong. And there is not a case under any remotely similar facts, which the district court- Okay, we have your argument on this. I'd like to ask you a question about something else, though, before you sit down. Sure. In your motion opposing their motion to file a late brief, you publicly submitted mediation communications. And I would like to know whether you got permission from the circuit mediator and the opposing parties to do that, because the usual rule is that mediation communications are confidential. And it seems to me that you violated our court rules. And I'm frankly at a loss to what it is that we submitted. You submitted emails about how much the offer was for settlement. We have all kinds of information about your settlement negotiations, totally inappropriately, and they're in the public docket. And I would agree. And our intention was only to file the one email about the scheduling. If there was a trail of emails, then- But you said in your brief, the reason I don't think they should be able to do this is because, I mean, they were sent- The whole thing is ridiculous, because they should have filed a brief. But you said that they shouldn't be allowed to do this because here is all this communication that's going on. And I don't understand how you could do that. And I'd have to go back and look at the record. If anything, we were just citing to the fact that the timing issue. And if there was a string of emails, then I apologize to the court if I wasn't prepared to address that issue today. But I didn't even know that occurred. Take a look at it. All right. Good morning. If it pleases the court, Adante Poynter on behalf of Plaintiff Appellees. I'm here and joined by Ayanna Cuevas, who was the principal writer of our brief in motion. I'd like to reserve three minutes of time. So, what we have here is, in this particular appeal- Wait, I'm a little bit confused. You want to reserve three minutes, but you're the appellee. I'm sorry, I misspoke, Your Honor. You're correct. I was going to say, what are you reserving for? Sir, appeal. Put him in the bank for some other argument. The court, I think, is getting this correct in the sense that the focus is what is taking place at the time the use of deadly force takes place in this case. And although there is a video, we don't think the video tells the entire context of what was taking place at the moment the use of deadly force was used against the decedent. But what is important is there is a third-party witness, independent third-party witness at that, that gave his observations as to what took place when the video was turned away at those fateful moments. Appellants essentially want to reverse or essentially ignore Mr. Chavez's observations which were given, which are a part of the record, by way of his deposition. And instead supplant what they think took place or what they want the story to be. However, we all understand that on motion for summary judgment, the court cannot necessarily ignore conflicting evidence in an attempt to resolve those factual disputes. We think those are material disputes. The officers are saying Mr. Mejia Gomez lunged and took these shears and were above his head. Mr. Chavez is saying that's not what took place and that he turned in a normal fashion towards the officers. Which, frankly, the officers were telling him to stop. So that may have actually been him complying with the officer's commands to stop once he got to the corner. We also take issue, or I should say our position is, that Mr. Mejia Gomez, as he was nearing the corner there, and he turns towards those officers. The officers themselves essentially did something that they could have done a long time ago, which is they got close to Mr. Gomez, but in this instance they decided to use their gun. Mr. Mejia Gomez was acting in the same behavior that he had been acting from the time that they had started confronting him and contacting him. Except for raising the shears, that was the focal point. And it was a finding by the district court that we have to accept, that he turned, raised the shears, and that certainly is an affirmative act. So the real question is, was it sufficient for the officers then to pull the trigger? Well, Your Honor, we disagree with the district court's interpretation. That's right, you disagree with it, but that's the factual finding we have before us. Well, there is, the record shows that Mr. Chavez says that it did not happen that way. I would have thought your response would be that this is summary judgment and there are no findings? Well, and that as well, I was working my way there, you're actually correct, Your Honor. It is on summary judgment, and the judge issued his opinion, but that is not an actual factual finding. We still would have been entitled to litigate that issue if the judge, which he ruled, which could go to trial on this case. If you go to trial. But just take for assumption, I understand your position, take for the assumption that the shears were raised and that that is a threat. And there at that time, according to counsel, some eight feet between the deceased and the police officers. What more would be necessary before the police officers would use, do they have to wait for the thrust to come? Do they have to wait for what? Well, first, the assumption that the court is asking me to make is something that's contradicted on the record. Okay. So there is no direct finding that the shears were raised. In fact, the third party witness says it did not take place that way. I ask you just to assume that. I know you don't agree with the facts, but assume that the district court was correct, that the shears were raised. Would that be sufficient? Well, then we have the defendant officer saying that the shears were not only raised, but they were used and lunged at them. So that is what they claim prompted them to fire and use deadly force. On top of the fact they said this, what I consider to be an arbitrary line of death, whereas if Mr. Mejia Gomez reaches this point, they were fully aware and intended to use deadly force against him. So what can you say? The answer to Judge Wallace's question is, of course, they were entitled to use force if those were the facts. Yes. But from our perspective and looking at the record, that is not what took place. Okay. I just ask you to make an assumption. If you can't do it, I'll move to some other area. It's an interesting area to me, and I'm one-third of the panel, so I appreciate you moving with me. Okay. Now you got that far. What is your best case that that's insufficient? The fact that he was raising the shears and the rest of this, assuming that's the facts that are going to be determined. Merely possessing the shears and turning around in response to the officers asking him to stop and no longer proceed is not enough in and of itself. Now I'm asking you, what's your best Ninth Circuit case? Mere possession of the weapon is not enough to warrant the use of deadly force, Your Honor. And if we're looking at Ninth Circuit cases, I believe the Court was just mentioning the Morris case, I believe it was, George V. Morris. But also we have other cases that we talk about in our brief wherein a person may have an edge weapon, but they are not using it as an offensively against the police officers, which have been ruled to be unconstitutional uses of deadly force. I take it you're not relying upon Lopez then, right? I was not relying upon Lopez at this time, as in my brief, because Lopez was not decided at that point in time. Why didn't you file your brief on time? Your Honor, it was simply a fall on our assort. We did not properly calendar it, and it did not get done. I've never seen a situation like this before. I mean, either as a practicing civil trial lawyer for 15 years, or for the years I've had on a bench, where we've had a situation like this where a brief is filed. Not filed in spite of giving, we give them every opportunity and we tell them what to do. I just can't imagine. Why can't you tell us why such a complete disregard of our rules would be followed? You're an experienced lawyer. Why would this happen? Your Honor, as I said, it wasn't intentional. It wasn't that we were- I didn't say it wasn't intentional. No lawyer would intentionally do it if they want to win on a case on appeal. But there's got to be some reason why there's such a dereliction of duty. Well, Your Honor, as I mentioned, this is a situation where we just did not get it done. It was not intentional. However, once it came to my personal attention, we tried to rectify that by getting the brief filed. I believe our court- I know, they come in, they say the secretary did it, and the rest of this. But the buck stops with the lawyer of the firm. And you're exactly correct. I believe our court reminded you on July 31st that the brief was over a month overdue, and it took a whole other month until August 28th for you to even file a motion seeking an extension of time. Understood, Your Honor. I cannot argue with those facts. All I can say is that once it came to my personal attention that it had not been done, we moved as quickly as we could to rectify the situation and get something filed with the court. And it's our apologies to that. However, we are here- It seems like there's been a pattern in this case where the district court thought your briefing was inadequate. Here, you didn't even file briefs. I mean, you may actually have a good claim, but I'm struggling a bit with whether you deserve to have it be preserved because of the behavior of counsel. But it's also unfortunate for your clients who may have a good claim. So you've put us in an awkward situation here. It is certainly very awkward. We are hopeful that given that we did get something filed, and also with my forthrightness in terms of why it was not done, that Your Honors would not deny my client a possibility of pursuing their claim. When you say your forthrightness on why it was not done, I still don't understand it. You said as soon as it came to your attention, you filed it. But why didn't that come to your attention? And if it came to an attorney's attention and they didn't tell you about it, is that attorney still working for you? Is that staff person still working for you? Well, Your Honor, as you mentioned, I'm here having to take the brunt of this, as I should, given my name is on the case. But internally, it caused a lot of turmoil within our firm, and we tried to rectify the situation so it would not happen again. What happened between July and August, end of July and end of August? A lot of writing, a lot of briefing, and getting this thing done. So it took a month to ask for an extension once you learned that you had missed your deadline? No, it should not have taken a month to ask for the extension. What did take a month was us trying to figure out what was going on, why this had not taken place, and then we moved swiftly to try to rectify it. And I'm here, once again, having to take the brunt of that, but I understand that given my name is on the case. The brief, did you read it before it was filed? Excuse me, Your Honor? Did you read the brief before it was filed? I did review the brief. What case of your list of cases is the closest case that you want us to look at? Well, Your Honor, we did cite Glenn, and we also have Hayes as two cases that we relied upon. And we also, defendants had mentioned Blanford, and we talked about how in our brief that Blanford, while defendants cite it as being something that supports them, we saw it as having some issues that was actually supportive of our position. I don't see you citing you haven't cited Lopez. No, Your Honor. Lopez, my understanding, was not decided at the time this brief was submitted. Your co-counsel knew all about Lopez because they took a drubbing at it. Lopez is very much in point. It's probably the closest case we've had to the case you have. I remember Lopez very well. I'm kind of surprised it wasn't discussed in the briefs. Yes, Your Honor. That's a very tragic case where a teenage boy was shot and killed by the police officers holding a fake replica AK-47. And, you know, my opinion is the Court got it right, and we could have included it in our brief if it had been decided at the time this brief was submitted. I hope from this that you may have a staff meeting and make some decisions. To practice before our Court, we require more, and we do take away the right people to practice before our Court if they don't follow our rules. So as a suggestion, you may want to look at your organization and see what's going on. I understand your lawyers are busy, and I'm not being critical. I was in the middle of that for 15 years. I know exactly what you're going through. But you have to respond to what we want in our Court. I'm sure you understand that. I'm not trying to be critical. I'm trying to be helpful. Understood, Your Honor. We've had staff meetings, and we'll continue to do so in order to make sure this doesn't happen again. It also seems that you knew about the existence of George v. Morris because you put it in your statement of jurisdiction, but never discussed it as a case that's about whether a weapon was really pointing. It seems pretty on point. Nowhere in the body of your brief is it discussed. Yes, Your Honor. So both sides get a challenge today. Apparently so. Thank you. Ms. Norris, any other questions? We'll give you two minutes for rebuttal.  Thank you, Your Honor. And just on the issue of — and I understand the factual dispute, although, again, I refer the Court to page 10 of the record, the district court, where it says, here the Prieto and Bakery videos show that Mejia Gomez removed the garden shears from the backpack and was holding the shears above and around his head. As he backed away. As he backed away, yes. Yes. But then Mr. Chavez, the witness, says that he turned toward the officers. So that issue of there's no doubt that he turned towards the officers. The district court says he has them raised over his head. And, you know, the Matsushita case where there may be some metaphysical dispute here. It seems like I'm still not understanding why you're telling us that the district court said this was a fact, given that that's not something the district court can do anyway. So we have to figure out whether there's a dispute of fact. It doesn't really matter what the district court said. The Supreme Court has instructed the district courts, when there is video, to view it through the light of the video. And I think — But we're just as well positioned to do that as the district court is, right? Yes. And I think that, albeit perhaps not crystal clear, if you break it down, which unfortunately officers don't have the ability to do, to freeze frame these things, the officers' belief, based on the totality of circumstances going in, is that this man is not just some simple drunk who happened along and is now carrying shears. He's already threatened a woman. He's already threatened them. The tasers didn't work. And now he's going to a crowded bakery. They're going to try to intervene. He has the shears in his hand raised. Any reasonable police officer would believe that that was an imminent threat. But the other thing, and I think we've lost it over the factual issue, is the case where this court said in S.B. v. San Diego County that whether it's a factual issue, and to quote the court, but that's not all, because then you still have to find a case that's clearly established. And that's what the Supreme Court continually sends these cases back about. Under Fourth Amendment, where officers in those difficult situations can't dissect it down into split seconds, there's a need to find a clearly established set of case law that would put these officers on notice beyond debate, that would put them on notice.  And that's what the Supreme Court is trying to do with decisions they're making. We understand. I understand your problem. But it's pretty hard under Lopez. I happen to disagree with Lopez. But it's pretty hard to say under Lopez that that hasn't been met. I think I've expressed myself in writing as to that view. But we have to look at the Ninth Circuit case, the majorities in the Ninth Circuit cases. How would you distinguish the Lopez finding or determination that there was sufficient prior warning to give the officers the necessary indicia to move? How is this case any different? How would you distinguish this case from Lopez? They cited specific cases in there that they said were sufficient and were governed by that. So how would you distinguish Lopez? Well, and I think that's where the Supreme Court continually comes back and says you have to have the specificity of the facts. Lopez is remarkably factually different than this case. Now, is there a disputed fact whether or not he was bringing that replica weapon up slightly? And I understand that. Lopez involved what the police officer logically thought was an AKA coming up to him and he shot him. But there was no factual basis for the officer to believe a crime had been committed. As you know, the boy was just reported walking down the street carrying a weapon. That's much different than someone who's broken into a house, threatened a woman with a weapon, tried to strangle her dog and exposed himself. That's a much different state of mind in totality than in Lopez. So I think that's how you distinguish it. You distinguish it by the pre-where in Lopez there was just a blast on the siren stop and the person didn't stop, didn't drop the weapon when told to and came around. You're saying that would be different from this case and we could distinguish Lopez on that basis. Very much so. Just like this Court and the Supreme Court in Sheehan had distinguished Glenn where there's no crime. Yeah. It's a suicidal boy with a knife to his throat. I understand your argument. Thank you. Thank you very much, Your Honor. Thank you, counsel. Thank you both sides. The case is submitted.
judges: Wallace, Friedland, Lasnik